UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO:

KELLI MARIE TSCHOPP,

      Plaintiff,

v.

PRISONER TRANSPORTATION SERVICES,
INC. f/k/a PRISONER TRANSPORTATION
SERVICES, LLC, BREVARD EXTRADITIONS,
LLC, U.S. CORRECTIONS, LLC, PTS OF
AMERICA, LLC, JOSH HENDERSON, AND
JOSH BAKER,

      Defendants.

_____/

**COMPLAINT FOR DAMAGES**
**(Jury Trial Demanded)**

David A. Frankel, Esq.
**Law Offices of David A. Frankel, P.A.**
4601 Sheridan Street, Suite 213
Hollywood, Florida 33021
(954) 683-0300
Fla. Bar Number 741779
David@BlueLotusLaw.com
eService@BlueLotusLaw.com

*Attorney for Kellie Marie Tschopp*

Plaintiff, KELLI MARIE TSCHOPP ("TSCHOPP" or "Plaintiff") sues the Defendants, PRISONER TRANSPORTATION SERVICES, INC, f/k/a PRISONER TRANSPORTATION SERVICES, LLC, BREVARD EXTRADITIONS, LLC, U.S. CORRECTIONS, LLC, PTS OF AMERICA, LLC, JOSH HENDERSON, and JOSH BAKER, jointly and severally, and states the following:

### JURISDICTION AND VENUE

1.      This action is brought by Plaintiff against a private PRISONER transport company, PRISONER TRANSPORTATION SERVICES, INC f/k/a PRISONER TRANSPORTATION SERVICES, LLC , and its three subsidiary companies (The three subsidiaries are collectively referred to here, along with the parent company, as "PTS" or "PTS Defendants") and two individuals who were formerly agents of PTS, pursuant to the state tort laws of the State of New Mexico and 42 U.S.C. §§1983, 1988, and the Eighth and Fourteenth Amendments to the United States Constitution. Jurisdiction is founded on 28 U.S.C. §§1331, 1343, 42 U.S.C. §1988, the constitutional provisions mentioned above, and under the state tort laws of New Mexico. Supplemental jurisdiction, and joinder of parties for state law claims are proper pursuant to 28 U.S.C. §1367(a) because they form part of the *same case or controversy*.

2.      Venue is proper in this Court because the violations of civil rights alleged are transitory in nature, and the Defendants do not all reside in one state. PRISONER TRANSPORTATION SERVICES, INC, f/k/a PRISONER TRANSPORTATION SERVICES, LLC and its three subsidiary companies are subject to personal jurisdiction in the Southern District of Florida because they act as one company regularly doing business in the Southern District of Florida.

2

## INTRODUCTION

3.      Over the course of seven days, through multiple states, the Plaintiff, a pre-trial detainee, was subjected to tortuous physical and emotional distress in the custody of the Defendants while being transported from Reno, Nevada to Elizabethtown, Kentucky.  The Plaintiff was subjected to inhumane conditions that included confinement in a crowded, unsanitary cage filled with human excrement and urine, denied her medications, denied proper food, water, and fresh air, and exposed to unbearable heat.  The Plaintiff seeks damages for the physical and emotional cruelty she suffered and the post-traumatic effects she continues to suffer.

## PARTIES TO THE LAWSUIT

4.      The Plaintiff, KELLI MARIE TSCHOPP (pronounced 'Chōpe'), is an adult resident of Reno, Nevada, and is otherwise *sui juris*.

5.      Corporate Defendant, PRISONER TRANSPORTATION SERVICES, INC. f/k/a PRISONER TRANSPORTATION SERVICES, LLC, (hereinafter "PTS") is a private for-profit corporation doing business across the United States contracting with state and local governments, correctional facilities, and law enforcement agencies to transport arrestees and incarcerated prisoners across jurisdictional lines.

6.      To transport prisoners and detainees, PTS is granted the power of arrest by the governmental agencies that contract for its services.  PTS is the equivalent of a government body acting under the color of law and subject to liability under 42 U.S.C. § 1983, as well as each state in which it operates.

7.      BREVARD EXTRADITIONS, LLC; U.S. CORRECTIONS LLC; and PTS OF AMERICA, LLC are subsidiary companies held and managed by PTS.  Although maintaining

3

separate names, the three subsidiaries are operated as one company without distinction in management, policies, and operations; therefore, all of the corporate Defendants are hereinafter collectively referred to as "PTS."

8.     Defendants, JOSH HENDERSON and JOSH BAKER, are former agents of PTS and the Plaintiff is currently attempting to affect service of process of them.

## GENERAL ALLEGATIONS

9.     The Plaintiff alleges, and intends to prove, that at all times material hereto, PTS, acting under the color of law, knowingly and purposely engaged in policies, customs, and practices which were deliberately indifferent to the safety and wellbeing of the prisoners in their custody and over whom they have complete control, including the Plaintiff.

10.     The Plaintiff alleges, and intends to prove, that at all times material hereto, PTS exploited a lack of governmental regulation and/or lack of meaningful governmental oversight to infringe upon the constitutional rights guaranteed to the prisoners in their custody and to violate tort laws, for the sake of profit.  And further, PTS does not perform transportation of prisoners in any manner similar to, or acceptable by, the official government agencies upon whose behalf they operate.  Instead, PTS knowingly operates in a cruel and horrific manner forcing prisoners to endure inhumane conditions of confinement.

11.     PTS's normal business operations depend upon its unfettered ability to exploit the inherent vulnerabilities of the prisoners in their custody – who are held isolated from the world in cages in darkness, without the ability to communicate with family or friends for days or weeks at a time, and unable to complain or defend themselves without becoming subject to retaliation.

4

12.    The PTS Defendants have each, as more fully set forth below, engaged in conduct that violates the Fourth, Eight, and Fourteenth Amendments and state tort laws of New Mexico, purposely and deliberately refusing to provide for the Plaintiff's basic human needs for sleep; the use of a bathroom; hygiene (washing, showering, brushing their teeth, or change of clothes); fresh air; comfort and wellbeing; sanitation; food; water; and medical treatment and necessary medications.

**Policies, customs, and practices of inhumane treatment**

13.    PTS operations are designed to transport the most prisoners, the farthest distances, in the shortest amount of time.  PTS is paid on a "per prisoner/per mile" basis, and as a matter of routine, seeks to maximize the number of prisoners transported during each trip to make each trip as profitable as possible.  This practice extends individual routes for unreasonable amounts of time, causing unsanitary and cramped conditions inside the cages, and places the prisoners and its own employees at increased risk of injury and emotional distress.

14.    The transportation vans used by PTS Defendants are outfitted with interior cages that resemble those used to control animals and were never designed or intended for long distance human travel.

15.    The vans have no windows or only blacked out windows, and prisoners are left in complete darkness for days at a time.

16.    The vans often do not have proper ventilation, air conditioning, or heat; leaving prisoners without fresh air and in extreme heat or cold.

17.    At all times material hereto, the vans used by PTS for transportation did not have seatbelts and/or PTS allowed prisoners to remain unseat-belted in the cages during travel.

This practice leaves prisoners vulnerable to physical and emotional injury when agents subject the prisoners to "rough rides" (see below).

18.    To avoid the cost of paying intermediate jail facilities to house prisoners each night and to complete transportation of prisoners in the shortest amount of time, the PTS Defendants operate under an express policy that requires prisoners, including the Plaintiff, to remain in transit, shackled in the cages, for 36 to 48 hours at a time without overnight rest.

19.    To avoid the costs of paying intermediate jail facilities to allow prisoners to use restrooms, PTS tolerates prisoners urinating and defecating in the vans – in bottles, on themselves, and on the floors.  Prisoners, including the Plaintiff, were forced to remain in these unsanitary conditions for days at a time.

20.    Prisoners do not leave the van when fed.  They remain shackled at the feet, with their wrists shackled to a waist chain, hunched over as much as possible to eat their meager meal among the filth of their own excrement.

21.    To avoid expenditures for medical treatment, PTS tolerates its agents ignoring *bona fide* medical necessities that arise during transportation.  Refusing medical treatment allows PTS to avoid time delays that affect their ability to schedule as many trips as possible in the shortest amount of time, and to avoid costs of treatment.  As a matter of policy, PTS refuses to allow their agents to provide medical attention unless the condition is a matter of "life or death."  A former manager is quoted as saying, "Unless a medical condition is 'life or death', [they] can't open the cage on the vehicle."  However, PTS has no established guidelines, and fails to provide sufficient training, to guide their agents to evaluate the severity of a medical condition or the need for treatment. This policy, practice, or custom led to the Plaintiff suffering seizures throughout her transportation from Nevada to Kentucky.

6

22.     To lower costs, PTS does not pay intermediate jail facilities to provide PTS prisoners with medical care during overnight housing.  Injuries suffered during transportation are therefore left untreated because jail medical staff refuse to provide care to prisoners in PTS custody.

23.     PTS fails to enforce its own policy which requires its agents to ascertain prisoners' medical condition and prescribed medications before travel and fails to supervise or discipline agents to remediate the violations.

24.     Transport agents routinely use intimidation and violence against the prisoners as methods of control and retaliation if they object to the mistreatment, such as: verbal threats and abuse; degrading language; use of restraints as weapons to inflict pain; denial of food, water and/or use of a toilet, and rough rides.

25.     At all times material hereto, PTS knew, or should have known, that its agents used rough rides (driving recklessly and erratically – tossing the prisoners about the cages) as a method of control or retaliation against prisoners, intending to frighten them when they complained about the conditions of their confinement.

26.     PTS's 36 to 48-hour travel policy with irregular intermediate stops denies prisoners, including the Plaintiff, the ability to stretch and move freely for unreasonably extended periods of time.

27.     At all times material hereto, PTS knew, or should have known, that its agents withheld food and water from prisoners as a method of punishment, or to limit the need to use a toilet.

**Inadequate policies for hiring, training, supervision and discipline**

28.     PTS makes no meaningful or genuine effort to supervise, monitor, or evaluate its agents' treatment of prisoners, and routinely overlooks their agents' failure to comply with the written policies and procedures, including, but not limited to, pre-trip procedures to ensure proper medical care or current medical conditions; documentation of incidents which occur during transportation that effect prisoners' safety and health; provision of medications; and provision of adequate sleep, rest, hygiene, toilet facilities and other basic human needs.

29.     PTS makes no genuine effort to enforce whatever policies or practices that do exist which are intended to protect prisoners from cruel and inhumane treatment during transportation. Any such policies or claimed practices are illusory and mere window-dressing.

30.     PTS fails to conduct meaningful investigations of known incidents of prisoner death and injury caused by the mistreatment or dangerous conduct of its agents.

31.     PTS purposely maintains policies, customs or practices that it knows create unbearable working conditions that would result in transportation agents quitting after brief periods of time – unable to perform the job as PTS mandated, and unwilling to sacrifice their own safety.

32.     The hiring policies of PTS are guided by the knowledge that its agents are short-time employees, in many cases just weeks.

33.     To maintain its workforce, PTS's hiring practices accept extradition agents who do not possess the temperament or qualifications to safely transport the prisoners.  To control prisoners, the employees routinely abuse the prisoners physically and verbally, intentionally over-tightening restraints, driving recklessly, withholding food and water, using racial epithets and other abusive language.

34.     PTS fails to train its agents to properly provide medical care, safe transportation and enforce prisoners' rights, and/or have no meaningful or adequate methods of evaluating the training they do provide to ensure proficiency.  Training is limited mostly to review of policy paperwork or tutorials that are too brief – without testing or proficiency evaluation.

35.     PTS has no meaningful program of in-service training and no program of periodic job performance evaluations.  At all times material hereto, what meager training efforts that were implemented were haphazard at best and allowed transfer agents to feel comfortable in their ability to mistreat the prisoners, violating rights and laws without fear of repercussion.

36.     The combination of all these practices and policies, acts and omissions, allows PTS to spend the least amount of money to transport the greatest number of prisoners in the least amount of time to maximize profits.

**Representations of efficiency and the myth of equivalency**

37.     PTS advertises that its services cost only a fraction of what it would cost official government agencies to transport prisoners.  Yet, to fulfill that representation, PTS does not transport prisoners in the same manner as official government agencies.  It is a myth that PTS performs its transport services and treats prisoners in a manner similar to the official government agencies upon whose behalf they operate.

38.     PTS advertises to prospective customers that its practices and policies emphasize the safety of prisoners as part of its operations.  This is false.

39.     The manner in which PTS transports prisoners is dictated by policies that prioritize cost saving measures over its obligation to transport prisoners safely, and to operate

over-the-road transport vehicles safely.  PTS policies, practices, and customs have predictably

resulted in grossly unsafe, unsanitary, and inhumane conditions of confinement, a widespread

pattern of injuries, medical emergencies, and deaths, as well as very low agent retention rates,

low job satisfaction, and hiring of unqualified agents.

### 20-case sample of injuries and deaths

### Tommy Lee Brenton

40.      In September 2009, Tommy Lee Benton was transported to Broward County

Jail from Hernando (Fla.) County Jail in an eight-person van with 11 other prisoners. Shackled

and chained, he began to complain when he experienced trouble breathing.   When he

continued to complain after being told to stop, the van was pulled over and the agents removed

him – dragging him to the ground – and kicking him as he lay on the hot pavement. Four years

later, the case was settled for $60,012.00.

### Stephanie Luna

41.       In July 2013, Stephanie Luna was transported from Dallas to Houston.  With

temperatures outside the van in the nineties and Ms. Luna, shackled in a small sectioned-off

cage without a/c vents, became dehydrated and begged for water.  The agents ignored her.

Suffering heat exhaustion, her nose began to bleed and she later experienced vaginal bleeding.

**Steven Galack**

42.      In July, 2012, Steven Galack was picked up in Florida for transportation to Butler County, Ohio.  By the third day of the trip, in Georgia, with ten other people in the van, he began to suffer heat related illness and became delusional.  This led to him being removed from the van and stomped on by the guards.  The supervising guard instructed "only body shots."  Seventy miles later in Tennessee, Galack was found dead.  The wrongful death lawsuit was settled.

**William Culpepper**

43.      Galack's death was one of five known to have occurred on a van operated by PTS.  William Culpepper complained of stomach pain for a day and a half before dying of a perforated ulcer.  Guards thought he was faking, so they ignored his pleas for medical care.

**William Weintraub**

44.    In 2014, guards mocked William Weintraub, a physics professor, who complained for days before he was found in the back of a van dead and covered in urine.  He also died from a perforated ulcer.

**Denise Isaacs**

45.      In 2014, Denise Isaacs, age 54, died in Miami onboard a van after she began acting bizarre and started drooling and gasping.  The guards refused to take her to the hospital.  Her autopsy later showed that she died from withdrawal from the anti-anxiety medication, diazepam, which guards were supposed to be giving her and were not.

**Kevin Eli**

46.     In March of 2017, Kevin Eli was being transported from Virginia to Florida to face a nine-year-old burglary charge.  Handcuffed and shackled, he began to complain about having trouble breathing.  When he refused to stop complaining, he was put in a segregation cage.  For the nest 30 minutes, Mr. Eli pleaded with the guards to call 911.  Thinking he was faking, they refused.  Mr. Eli died.  The death investigation also revealed he and other prisoners were also abused and denied basic human rights.  Women were found to be making tampons out of McDonald's wrappers, in front of the male prisoners, and urinating in plastic bottles with the tops cut off.  Prisoners reported being taken on joy rides at high speeds, sometimes crossing the median and knocking into road signs, as they were flung around in their cages.

**Theresa Wrigley**

47.   Theresa Wrigley was on Eli's bus and watched him die.  Wrigley, who has diabetes, was being transported from Wisconsin to Florida to face a charge of improperly using a company credit card.  She said that during her two-week journey, she was given her medication intermittently and fed only fast food and that she vomited repeatedly.

**Lauren Sierra**

48.   In 2014, Lauren Sierra was repeatedly sexually assaulted by a PTS extradition agent.

**Joe Mondragon**

49.     In March of 2014, while being driven from New Mexico to Colorado, Joseph Mondragon claims that the guards burned his eye with a cigarette, repeatedly sprayed him

with pepper spray, used a derogatory term for Latinos, and forced him to sit in his own feces, urine, and blood.

**Tabitha Phelps**

50.     In June of 2014, Tabitha Phelps was being transported from Joliet, Illinois to Winnebago County Jail in Wisconsin.  During the three-day trip, Phelps was forced to engage in sexual activities with the male inmates and with a guard as other extradition agents stood by watching.

**Roberta Blake**

51.     On August 26, 2014, Roberta Blake was picked up for transport from Ventura, California to Baldwin County, Alabama.  Blake was handcuffed and shackled and put in a small sectioned-off area in the van that had no air conditioning.  She was denied her prescription medicine and medical care after losing consciousness several times.  During the trip, she was not seat-belted and was tossed about the van due to erratic driving by the guards. Because the guards would not give restroom stops, Blake urinated on herself and vomited on herself.  The agents permitted the male prisoners to reach into the cage area and rip off Blake's clothing and then the agents took pictures of her without clothing.  While enroute, she began menstruating.  The guards refused her sanitary napkins, forcing her to use a McDonald's cup and napkins in front of other prisoners and the guards.

**Jeffrey Groover**

52.     In August of 2015, Jeffrey E. Groover was picked up for transport at FCI Butner in North Carolina.  During the 52-hour road trip to Broward County, Groover was forced to sit in a "dog cage" as the van driver called it, which measured just 34 inches wide by 42 inches

high.  There was no air conditioning and only one small vent.  The van rarely stopped for breaks.  Groover was allowed just one cup of water and some food every eight hours.  After 24 hours into the trip, Groover suffered delusions and vomited.  The driver gave him an extra cup of water.  Groover suffered heat stroke.

### Darren Richardson

53.    In 2015, Darren Richardson spent ten days in a van from Florida to Pikes County, Pennsylvania.  During that ten-day ride, the guards put a shotgun to his head, urinated on him, and tried to extort his property.  The guards put him in a cage with shackles so tight that his legs from the knees down turned purple by the time the trip was over.

### Serica Hadnot

54.    On June 23, 2016, Serica Hadnot, pregnant, was being transported from Hamilton County, Ohio to Marion County Indiana, a 100-mile trip that took three days.  The extradition agents knew she was pregnant.  During the transport, Hadnot was shackled around her abdomen.  She became overheated numerous times, yet her requests for ventilation were ignored.  Male prisoners were urinating in plastic bottles and throwing the urine at her and other female prisoners.  PTS agents refused her water even though she was dehydrated.  The agents refused to give her pre-natal vitamins which they possessed.  When she began to bleed from the vagina, her request to go to the doctor were ignored.  As a result, Hadnot suffered a miscarriage.

### Edward Kovari

55.    On September 12, 2016, Edward Kovari was picked up in Winchester, Virginia for transport to Texas to face charges that he had stolen a car. The charges would later be

14

dismissed. During the trip, Kovari and other inmates, while always shackled, were forced to urinate in bottles, take turns sleeping on the van's floor, and watch as other inmates defecated and vomited in the van and then have to sit in it. Like this case, Kovari was denied his medication and asked daily to go to the hospital but was denied. When Kovari finally got to the Harris County, Texas jail, his systolic blood pressure was very high and he was forced to stay in the jail infirmary for two days until his condition stabilized.

**Joseph Jackson**

56. On June 30, 2016, Joseph Jackson was picked up in Bernalillo County, New Mexico to be transported to Miller County, Arkansas. Jackson was on medicine for high blood pressure. The corporate Defendants' agents refused to fill his prescription. With the high blood pressure, Jackson was to be on a low-sodium, fat-free diet; however, the agents forced him to eat off the Dollar Menu at McDonald's. Jackson began experiencing visual interference, profuse sweating, and lethargy. Jackson's requests for medicine and alternative food were ignored. Finally, Jackson lost consciousness in Texas and was hospitalized.

**Rajkumar Dhameja**

57. From September 28 through October 7, 2016, Rajkumar Dhameja was transported in multiple vans from the Los Angeles County Jail in California to the Norfolk County Jail in Massachusetts. During the trip, the agents sadistically subjected Mr. Dhameja to a litany of severe physical and psychological abuse during the transport. The abuse included forcing him to sit and lie for extended periods in the festering human waste of himself and others, unreasonable tightening of the restraints on his wrists and legs for days for the sole purpose of inflicting pain, allowing 18 hours or more to elapse between restroom breaks

even though the vans had no toilets, and failing to seatbelt him or any other people being transported while intentionally and violently swerving the van, accelerating, and slamming on the brakes to inflict pain and injuries on the helpless people inside.

**Hai Nguyen**

58.    In September of 2017, Mr. Nguyen was transferred from the New Jersey State PRISONER to the Sacramento County Jail in California.  During the trip, the van became so hot that prisoners began to complain by shouting and banging on the cages.  In response, the PTS agents drove the van recklessly causing he and other prisoners to be tossed off the benches where they sat.  Before entering the van, Mr. Nguyen requested to be sea-t-belted in, but the agents ignored him.  During the "rough ride," Mr. Nguyen injured his lower back.  He requested medical treatment but was denied.  Mr. Nguyen's return trip was the same trip where Mr. Buck required emergency medical treatment.  During that rough ride, Mr. Nguyen suffered injury to his neck which will require surgery.

**Luis Hernandez**

59.    On or about March 27, 2017, Luis Hernandez was taken into custody from a detention center in Redwood City, San Mateo County, California based on a 1998 warrant from Broward County, Florida.  Mr. Hernandez had numerous medical ailments requiring specific medications, including lisinopril, amlodipine, and metformin, without which he was in danger of stroke, heart attack, kidney failure, or death.  The normally 46 hours of travel to South Florida took over 230 hours -- nearly ten days.  Over the course of the transport, Mr. Hernandez was handcuffed, his legs were shackled, and he was confined to a steel bench on one side of the van.

He was unable to stretch or straighten his legs during the transport because the steel divider was positioned directly in front of him. With barely any room for his shackled legs, his knees would repeatedly hit against the divider. He was also forced to lean forward in his seat so his head would not strike the top of the van. Mr. Hernandez remained in this same position, without being able to move, walk, or stand, for as many as 12 continuous hours at a time.  His wrists and ankles became severely swollen and his legs completely numb. Mr. Hernandez informed the agents that he was in pain; however, they ignored his complaints.  Due to not receiving his medications, Mr.  Hernandez became ill, disoriented, and developed diarrhea, forcing him to defecate on himself in the van.  The van was not stopped to allow him to clean himself.   On another occasion, an individual got sick and vomited in the back of the van.  Again, the van was not stopped to clean the mess and Mr. Hernandez was forced to spend days sitting in vomit and his own human waste.  Mr. Hernandez was only allowed to shower on two occasions during the ten-day transport.  Mr. Hernandez began to become increasingly sick. Once Mr. Hernandez arrived in Fort Lauderdale, Florida, wrist surgery and emergency treatment in the hospital were required to stabilize his condition.

**Eric Buck**

60.      Over the course of 68 hours, through four states, the Plaintiff, a pre-trial detainee, was subjected to tortuous physical and emotional distress in the custody being transported from Las Vegas, Nevada to McKinney, Texas.  Crowded into an unsanitary cage

filled with human excrement, denied his medications, proper food, water, and fresh air, and exposed to unbearable heat, the Plaintiff became unconscious from heat exhaustion requiring emergency medical rescue.  Forced by the Defendants to leave the hospital prematurely, the Plaintiff was put back into the van and exposed to these same inhumane conditions during the remainder of the trip.  The Plaintiff seeks damages for the physical and emotional cruelty he suffered and the post-traumatic effects he continues to suffer.

61.     These instances, and dozens of others, including at least five deaths, establish a widespread pattern of which PTS knew, or should have known, thus constituting a policy of deliberate indifference.

62.     This deliberate indifference resulted in Agents HENDERSON and BAKER becoming comfortable in the knowledge that they could mistreat the Plaintiff and other prisoners without repercussion, discipline, or termination, and was the moving force causing the Plaintiff's injuries.

**Plaintiff's Hell Ride Through Nevada, Arizona, New Mexico, Texas, Arkansas, Illinois, Missouri and Kentucky**

63.     On or about January 10, 2017, agents went to the Washoe County Jail in Reno, Nevada in an attempt to take custody of the Plaintiff for transport to Kentucky by over-the-road travel.  However, Washoe County Jail officials refused to release Plaintiff, indicating to the PTS agents that Plaintiff's serious medical issues required that she be transported to Kentucky by airplane.  In violation of that medical advice, PTS agents HENDERSON and BAKER returned to the Washoe County Jail on January 27, 2017 and falsely represented to jail officials that they were there to transport the Plaintiff to the local airport where she would be transported by air to Kentucky.

64.     Prior to leaving the Washoe County Jail, HENDERSON and BAKER were provided with a supply of Plaintiff's present medications to be administered according to a specific regimen.   Additionally, HENDERSON and BAKER were furnished with a prescription for an anti-convulsant medication called Keppra.   The Washoe County Jail medical staff failed to also provide a necessary prescription for a rescue medication in the event of serious seizures.

65.     HENDERSON and BAKER did stop at a local pharmacy and filled the prescription; however, upon learning that she was prescribed Keppra, Plaintiff immediately notified HENDERSON and BAKER that the Washoe County Jail medical staff had prescribed the wrong anti-convulsant medication, as she was highly allergic to Keppra.   Plaintiff also notified the agents that the jail medical staff neglected to prescribe her emergency seizure rescue medication.   Plaintiff pleaded with the agents to contact the Washoe medical staff or return to the facility to correct the mistakes; however, to avoid further delay, they refused.

66.     Throughout the entire trip, HENDERSON and BAKER ignored the Plaintiff's medication regimen (as well as other prisoners'), providing her proscribed medications randomly, and for periods of time not at all.

67.     For days at a time, BAKER and HENDERSON forced the Plaintiff and other prisoners to remain locked in the van without a restroom break.   During this time, prisoners were forced to urinate and defecate in the van, on themselves, and onto the floors, creating unsanitary conditions from which the Plaintiff could not escape.   At no time during the trip did HENDERSON or BAKER make any attempt to empty the passenger compartment of the accumulating human filth, or clean up the garbage.

68.     Without her proper medication, the Plaintiff began to suffer seizures soon after the ordeal began.   These seizures continued throughout the entire trip, from state to state, from Nevada to Kentucky.

69.     Due to these seizures, the Plaintiff was unable to safely remain on the bench seat inside the women's cage; therefore, she was forced to lie on the floor amid human filth.

70.     The PTS van had no lighting in the prisoner compartment and the Plaintiff remained in darkness for almost the entire trip.

71.     For days at a time while confined in the van, the Plaintiff and other prisoners were denied the opportunity to bathe, change their clothing, or even brush their teeth.  Female prisoners in the van were denied sanitary napkins and were forced to use MacDonald's napkins instead.

72.     The PTS van had no system to regulate the temperature in the prisoner compartment and the temperature at night became cruelly cold and unbearably and dangerously hot during the day.  The prisoners' compartment was not ventilated, and the air remained fetid, stale, and stinking of human waste and garbage throughout the journey.

73.     The Plaintiff and the other prisoners had trouble breathing, became nauseous, dizzy, and delirious at times.

74.     The van made no provision for sleep or rest and the Plaintiff and prisoners remained in a state of extreme exhaustion and disorientation, at times unaware of day or night or where they were.

75.     The Plaintiff and the other prisoners were denied the opportunity to contact family or friends simply to say they were alive.

76.     To the outside world, the Plaintiff and other prisoners went "dark."  And PTS used its ability to isolate the Plaintiff and other prisoners to abuse them and deny then even basic human rights.

77.     Throughout the trip the prisoners desperately complained to BAKER and HENDERSON that they were suffering because of these horrible conditions. However, their complaints were either ignored or resulted in intimidating threats (including the threat to withhold food and water, which did occur), or purposeful erratic driving by whichever agent was driving intended frighten the prisoners.

78.     The cages where the prisoners were kept were cramped and for periods of time severely overcrowded, exacerbating the danger of the harmful conditions.

79.     Throughout the trip, the Plaintiff and other prisoners remained shackled at the feet and with their hands cuffed and locked to waist chains, making their suffering even worse because they could not stretch or move their arms or legs.  During legs of the trip, the Plaintiff's shackles became tighter; however, because of neglect, ignorance, or as punishment, neither HENDERSON nor BAKER made any attempt to readjust her restraints as is customary for prisoner transportation, as shackles tend to tighten over time.

80.     As a matter of policy, or accepted practice and custom, PTS allots only $3.00 per meal for each prisoner.  This meager allotment results in prisoners going hungry, which occurred in this instance.  Moreover, HENDERSON and BAKER, in accord with company policy and practice, only purchase junk food and water for the prisoners, and make no provision for special diets.

81.     At the time of Plaintiff's incarceration and transportation by the Defendants, she maintained a strict vegetarian diet to support her overall health regimen.  When she

explained this to HENDERSON and BAKER, they ignored her requests for accommodation. For several days, the Plaintiff fasted, hoping to avoid the deleterious meat products served at fast food restaurants. Over time, however, her hunger forced her to eat what HENDERSON and BAKER provided even though it was detrimental to her health and comfort.

82.     During the trip, the conditions remained so noxiously dangerous that two of the prisoners required emergency hospital treatment.

83.     In all, the Plaintiff remained in the van under inhumane conditions for days at a time in her soiled clothes, unwashed and without the ability to brush her teeth, overcome by fetid air, forced to lie in human waste, hungry, experiencing difficulty beathing, in constant fear, unable to sleep, disoriented, powerless to notify family or friends of the abuse, isolated in darkness, suffering seizures and knowing her emergency medication was not available, unable to move her arms or legs, in shackles that were causing increasing levels of pain.

84.     Also of note, when the Plaintiff was delivered to Hardin County, Kentucky, HENDERSON slipped his personal cellphone number and contact information on a piece of paper into my purse and then got Plaintiff's phone number, presumably from her PTS file. He then monitored her Hardin County case to determine when she was released and began stalking her, texting and calling her on the telephone wanting to "get together," "date," and "hook up," creating an even greater fear that her ordeal was not over because PTS permitted or was deliberately indifferent to the actions of its agents.

### *INJURIES TO THE PLAINTIFF*

85.     Throughout the transportation, the Plaintiff  suffered severe emotional and physical distress caused by dehydration, hunger, intimidation, excessive use of force (erratic driving and pain caused by restraints), heat related illness, lack of adequate fresh air, trouble

breathing, lack of proper medication, disorientation, humiliation, lack of hygiene, lack of adequate food, and unimaginable fear and isolation

86.     Following her release from custody, the Plaintiff returned to Reno, Nevada and sought medical attention and psychological therapy.

87.     As a direct and proximate result of the cruel and inhumane treatment inflicted by the Defendants, the Plaintiff continues to suffer from the myriad symptoms of post-traumatic stress that will continue into the future.

### *FEDERAL CAUSES OF ACTION*

#### Count I
#### 42 U.S.C. §1983 *Monell* Claim
#### (PTS Defendants)

88.     Plaintiff hereby incorporates paragraphs 1 through 7 and 9 through 87 above, as if specifically set forth herein.

89.     At all times material hereto, the PTS Defendants acted under the color of governmental authority and law in performing functions traditionally reserved to the state, namely the extradition and transport of prisoners and pretrial detainees.  Therefore, PTS is a state actor and subject to the same laws and rules applicable to any governmental entity, including 42 U.S.C. § 1983.

90.     While PTS is not vicariously liable for its employees' violations of civil rights, the PTS Defendants are liable for their policies, procedures, practices and customs that have the force of official policy and permit abuses to occur because the policies encourages a culture that, once entrenched, can rarely be corrected without fundamental change.

91.     At all times material hereto, PTS, knew, or reasonably should have known, of numerous deaths and significant injuries that occurred as a result of established

customs and practices that dictated the manner in which they operated and, therefore, had the equivalency of corporate policy.

92.     At all times material hereto, PTS knew, or reasonably should have known, that their adopted policies violated basic human rights constituting cruel and unusual punishment, and that injury to the Plaintiff was foreseeable.

93.     At all times material hereto, PTS remained deliberately indifferent to the foreseeability of injury to the Plaintiff and other prisoners.

94.     As a direct and proximate result of its policies, PTS subjected the Plaintiff to overcrowded, unsanitary, and unsafe conditions of confinement and denied her necessary medication and medical treatment for a prolonged time, starvation, insomnia, excessive heat exposure, and dehydration, causing physical and emotional injury that continue now and will continue in the future.

95.     These policies, express and implied, exist across operations of PTS and all its subsidiaries, and are the "moving force" of Plaintiff's damages.

**WHEREFORE**, the Plaintiff, KELLI MARIE TSCHOPP, requests this Court to enter judgment against Defendant, PTS and/or its subsidiaries, and award the Plaintiff compensatory and punitive damages, as well as costs and attorney fees pursuant to 42 U.S.C. §1988, and all other further relief this Court deems just and proper.  Plaintiff demands trial by jury for all issues so triable by right.

<u>**Count II**</u>
<u>**42 U.S.C. §1983 Claim**</u>
**(Defendants BAKER and HENDERSON)**

96.     Plaintiff hereby incorporates paragraphs 1 through 4, 8 through 36, 61 through 87 above, as if specifically set forth herein.

97.     At all times material hereto, Defendants BAKER and HENDERSON were state actors and subject to same laws and rules applicable to any official government actor, including 42 U.S.C. § 1983.

98.     As stated with particularity above, Defendants BAKER and HENDERSON each inflicted cruel and unusual punishment upon the Plaintiff by denying him basic human rights, subjecting him to injury and needless abuse.

99.     Defendants BAKER and HENDERSON deprived Plaintiff of necessary medical care and medications and subjected her to injury which they themselves caused over the course transporting her to Kentucky.

100.     As a direct and proximate result of these constitutional deprivations, the Plaintiff was subjected to overcrowded, unsanitary, and unsafe conditions of confinement and was denied necessary medicine, food, and water for a prolonged time, causing him physical injury, starvation, insomnia, excessive heat exposure, and dehydration, resulting in  permanent physical and emotional injury that continues now and will continue in the future.

**WHEREFORE**, the Plaintiff, KELI MARIE TSCHOPP, seeks Order of this Honorable Court for judgment against Defendants BAKER and HENDERSON, awarding the Plaintiff compensatory and punitive damages, as well as costs and attorney fees pursuant to 42 U.S.C. §1988, and all other further relief this Court deems just and proper.  Plaintiff demands trial by jury for all issues so triable by right.

***STATE TORTS***

**Count III**
**Breach of Duty - Negligent Training**
**(PTS Defendants)**

101.     Plaintiff hereby incorporates paragraphs 1 through 87 above, as if specifically set forth herein.

102.     A source and cause of the abuse and injury suffered by the Plaintiff and others was the inadequate training and evaluation provided the PTS Defendants to its transport agents.

103.     To the extent that these deficiencies in training and evaluation resulted in abuses by BAKER and HENDERSON, intended to serve their own individual objectives in controlling the Plaintiff and other prisoners, such as "rough rides," threats of physical violence, and verbal abuse, which did not serve their employers' interests, PTS breached a duty to properly train BAKER and HENDERSON, and properly evaluate the effectiveness of that training.

104.     Based on the widespread abuses that were taking place, up to and including the time Plaintiff was injured, PTS knew, or reasonably should have known, that its training and evaluation programs were deficient but failed to correct them.

105.     These failures constituted a breach of duty by PTS, undertaken as a common carrier of incarcerated prisoners, to properly train and evaluate its transportation agents.

106.     As such, the PTS corporate Defendants' breach of that duty was a direct and proximate cause of the physical and emotional injuries and pain and suffering that befell upon the Plaintiff at the hands of BAKER and HENDERSON.

107.     As a direct and proximate result of the PTS corporate Defendants' lack of training and evaluation, the Plaintiff was subjected to overcrowded, unsanitary, and unsafe conditions of confinement and was denied necessary medicine, food, and water for a prolonged time, causing her physical injury, starvation, insomnia, excessive heat exposure, and dehydration, resulting in  permanent physical and emotional injury that continues now and will continue in the future.

**WHEREFORE** the Plaintiff, KELLI MARIE TSCHOPP, seeks judgement of this Honorable Court against the PTS Defendants, awarding him compensatory and punitive damages, and such other relief as the Court deems just and proper.  The Plaintiff seeks trial by jury for all causes of action so triable.

<u>**Count IV**</u>
<u>**Breach of Duty - Negligent Supervision**</u>
**(PTS Defendants)**

108.     Plaintiff hereby incorporates paragraphs 1 through 7 and 9 through 80 above, as if specifically set forth herein.

109.     A source and cause of the abuse and injury suffered by the Plaintiff and others was the inadequate supervision provided by the PTS Defendants to its transport agents.

110.     To the extent that these deficiencies in supervision resulted in abuses by BAKER and HENDERSON intended to serve their own individual objectives in controlling the Plaintiff and other prisoners, such as "rough rides," threats of physical violence, and/or verbal abuse, which did not serve their employers' interests, the PTS Defendants breached a duty to properly supervise BAKER and HENDERSON, to prevent physical and emotional injury.

111.    Based on the widespread abuses that were taking place, up to and including the time Plaintiff was injured, the PTS Defendants knew, or reasonably should have known, that their supervision policies were deficient but failed to correct them.

112.    These failures constituted a breach of duty by the PTS Defendants, undertaken as a common carrier of incarcerated prisoners, to properly supervise its transportation agents.

113.    As such, the PTS Defendants' breach of that duty was a direct and proximate cause of the physical and emotional injuries and pain and suffering that befell upon the Plaintiff at the hands of BAKER and HENDERSON.

114.    As a direct and proximate result of the PTS Defendants' lack of supervision, the Plaintiff was subjected to overcrowded, unsanitary, and unsafe conditions of confinement and was denied necessary medicine, food and water for a prolonged time, causing him physical injury, starvation, insomnia, excessive heat exposure, and dehydration, resulting in  permanent physical and emotional injury that continues now and will continue in the future.

**WHEREFORE** the Plaintiff, KELLI MARIE TSCHOPP, seeks judgement of this Honorable Court against the PTS Defendants, awarding him compensatory and punitive damages, and such other relief as the Court deems just and proper. The Plaintiff seeks trial by jury for all causes of action so triable.

### Count V
### Breach of Duty - Negligent Retention
### (PTS Defendants)

115.    Plaintiff hereby incorporates paragraphs 1 through 7, 9 through 87 above, as if specifically set forth herein.

116.    A source and cause of the abuse and injury suffered by the Plaintiff and others was knowing retention of transport agents who were dangerous.

117.    To the extent that the PTS Defendants' willingness to retain agents who pose a risk to the prisoners resulted in abuses by BAKER and HENDERSON which were intended to serve their own individual objectives in controlling the Plaintiff and other prisoners, such as "rough rides," threats of physical violence, and verbal abuse, which did not serve their employers' interests, the corporate Defendants breached a duty to properly discipline and terminate BAKER and HENDERSON, to prevent physical and emotional injury.

118.    Based on the widespread abuses that were taking place, up to and including the time Plaintiff was injured, the PTS Defendants knew, or reasonably should have known, that their retention policies were deficient but failed to correct them.

119.    These failures constituted a breach of duty by the PTS Defendants, undertaken as a common carrier of incarcerated prisoners, to properly supervise its transportation agents.

120.    As such, the PTS Defendants' breach of that duty was a direct and proximate cause of the physical and emotional injuries, and pain and suffering that befell upon the Plaintiff at the hands of BAKER and HENDERSON.

121.    As a direct and proximate result of the PTS corporate Defendants' negligent retention of HENDERSON and BAKER, the Plaintiff was subjected to overcrowded, unsanitary, and unsafe conditions of confinement and was denied necessary medicine, food and water for a prolonged time, causing her physical injury, starvation, insomnia, excessive heat

exposure, and dehydration, resulting in  permanent physical and emotional injury that continues now and will continue in the future.

**WHEREFORE,** the Plaintiff, KELLI MARIE TSCHOPP, seeks judgement of this Honorable Court against the PTS Defendants, awarding him compensatory and punitive damages, and such other relief as the Court deems just and proper. The Plaintiff seeks trial by jury for all causes of action so triable.

<u>**Count VI**</u>
<u>**Intentional Infliction of Emotional Distress - State Tort Claim**</u>
**(PTS Defendants)**

122.     Plaintiff hereby incorporates paragraphs 1 through 7 and 9 through 87 above, as if specifically set forth herein.

123.     To the extent the malign acts of BAKER and HENDERSON were committed in furtherance of the PTS corporations' interests (such as unnecessarily long, indirect routes, deprivation of sleep, rest, comfort, unsanitary conditions, refusing to administer medicine, rushing Plaintiff's hospital care, and more, as alleged above), the corporate Defendants are vicariously liable.

124.     Plaintiff alleges that these malign acts were extreme and outrageous, violating norms of decency in a civilized society – even more so where the agents took advantage of the Plaintiff's vulnerability as a helpless prisoner – and wholly unjustified even in performing the services under difficult circumstances.

125.     Abuse of power and control is a significant factor in the calculus of infliction of emotional distress.

126.     As a direct and proximate result of the PTS agents' abuse of the Plaintiff, she suffered, and continues to suffer, extreme emotional distress in the form of extreme

anguish – fearing for her safety during the trip, enduring injuries and pain for extended periods of time, fearing retaliation if he sought attention, personal degradation and humiliation, and continuing emotional and physical injury.

WHEREFORE, the Plaintiff, KELLI MARIE TSCHOPP, requests this Court to enter   judgment against the PTS Defendants  for intentional infliction of emotional distress, awarding compensatory and punitive damages, and all other further relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury of all issues so triable as of right by jury.

DATED this 16th day of November, 2020.

/s/ David A. Frankel
DAVID A. FRANKEL
**Law Offices of David A. Frankel, P.A.**
Attorneys for Plaintiff
4601 Sheridan Street, Suite 213
Hollywood, FL 33021
(954) 683-0300
David@BlueLotusLaw.com
eService@BlueLotusLaw.com
Paralegal@BlueLotusLaw.com
FLA. BAR NO.  741779